D. Stephen Melchior (W.S.B. #5-2885)
Melchior Law Firm, P.C.
2010 Warren Avenue
Cheyenne, WY 82001
(307) 637-2323 (Office)
melchiorlawfirm@aol.com

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2014 APR  9  PM 1 25

STEPHAN HARRIS, CLERK
CHEYENNE

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

Docket No. _____

| | |
|---|---|
| MICHAEL L. PLEMENS, <br><br> Plaintiff, <br><br> v. <br><br> LARAMIE COUNTY COMMUNITY COLLEGE, a Wyoming Corporation and State Educational Institution, <br><br> and <br><br> DR. JOE SCHAFFER, CAROL HOGLUND, BILL DUBOIS, DON ERICKSON, KEVIN KILTY, CHRISTINE LUMMIS, BRENDA LYTTLE, CAROL MERRELL and ED MOSHER, in their professional capacities as members of the Laramie County Community College Board of Trustees, <br><br> and <br><br> ROB  BENNING, ROBERT LAFASO, LARRY VANWHY and JARED COOPER as employees and/or instructors for Laramie County Community College, <br><br> and <br><br> DOE1 - DOE7, employees of Laramie County Community College <br><br> Defendants. | 1 4CV0 75 J |

## COMPLAINT AND JURY DEMAND

**COMES NOW** Plaintiff, Michael L. Plemens, by and through his undersigned counsel, and for his Complaint and Jury Demand against Defendants does hereby state and allege as follows:

### I.

### PARTIES

1.     **THAT** Plaintiff Michael Plemens is, and at all times relevant and material hereto was, a resident of the County of Laramie, State of Wyoming.

2.     **THAT** Laramie County Community College (hereinafter "Defendant LCCC"), is now, and at all times relevant and material hereto was, a corporation organized and existing under the state of Wyoming with its principal offices located at 1400 East College Drive, Cheyenne, WY 82009.

3.     **THAT** LCCC is now, and at all times relevant and material hereto was, an educational institution of the State of Wyoming.

4.     **THAT** the individual Defendants: Dr. Joe Schaffer, Carol Hoglund, Bill Dubois, Don Erickson, Kevin Kilty, Christine Lummis, Brenda Lyttle, Carol Merrell and Ed Mosher, Rob Benning, Robert Lafaso, Larry Vanwhy, Jared Cooper and DOE1 through DOE7 are, or were at all times material hereto, board of trustee members, agents, officers, employees, or representatives of Defendant LCCC and/or Defendant State of Wyoming.

5.     **THAT** the true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants DOE 1 through DOE 7, inclusive, are unknown to Plaintiff at this time. Plaintiff sues such Defendants by their fictitious names and will seek leave of the Court to amend this *Complaint* to show their true names and capacities if and when they have been ascertained.

6.     **THAT** Plaintiff is informed and believes and based upon such information and belief alleges that Defendant LCCC and the individual Defendants designated, whether by name or as a

DOE, are negligently or otherwise legally responsible for the events and happenings referred to in this *Complaint*, and negligently or otherwise unlawfully caused the injuries and damages alleged in this *Complaint*.

7.     **THAT** for the purposes of this *Complaint*, Defendant LCCC and the individually named Defendants and DOE Defendants shall hereinafter be collectively referred to as "Defendants," and that any reference hereinafter not made to the collective Defendants in this matter shall provide additional information to identify the subject Defendants individually.

## II.

## JURISDICTION AND VENUE

8.     **THAT** Plaintiff incorporates herein and re-alleges by this reference all preceding paragraphs of this *Complaint*.

9.     **THAT** this Court has jurisdiction over the federal claims in this action pursuant to 28 U.S.C. §§1331, 1343, and supplemental jurisdiction over the state claim pursuant to 28 U.S.C. §1367.

10.     **THAT** a proper claim was filed on August 12, 2013 pursuant to the *Wyoming Governmental Claims Act*, W.S. §§1-39-101, *et seq.*, and the *Constitution of the State of Wyoming*, Article 16 §7, to the proper authority in this case, Carol Hoglund, Vice President of Administration & Finance, Laramie County Community College, 1400 East College Drive, Cheyenne, WY 82009 as evidenced by **Exhibit 1** attached hereto and incorporated herein as if fully set forth herein by this reference; and said authority declined and/or denied said claim on or about December 20, 2014 as evidenced by **Exhibit 2**, attached hereto and incorporated herein as if fully set forth herein by this reference.     11.     **THAT** this Court has jurisdiction of this matter over the parties by virtue of the authority set forth immediately herein above, as well as W.S. §1-39-117(a); and venue is proper

in this jurisdiction pursuant to 28 U.S.C. §1391.

## III.

## FACTS COMMON TO ALL CAUSES OF ACTION

12.     **THAT** Plaintiff incorporates herein and re-alleges by this reference all preceding paragraphs of this *Complaint.*

13.     **THAT** Plaintiff, Michael L. Plemens, is an ex-serviceman, having served our county in the 1st Calvary Division of the United States Army from September of 1990 until April of 1991, including active deployment in Desert Storm.

14.     **THAT** as with many of the brave solders that have sacrificed so much for us at home, Plaintiff endured horrific events and eventually was discharged due to a positive diagnoses of Post Traumatic Stress Disorder ("PTSD").

15.     **THAT** after returning home from the war, Plaintiff continually struggled to work through the day-to-day consequences of his PTSD.

16.     **THAT** Plaintiff's recovery has taken precious years of enjoyment from his life.

17.     **THAT** since his return from combat, Plaintiff has actively sought counseling from the United States Department of Veteran's Affairs ("VA") and particularly with his VA counselor, Lewis P. Waldron.

18.     **THAT** Plaintiff's struggles with the post-war symptoms of PTSD, including hyper-vigilance which kept him exhausted and depressed.

19.     **THAT** Plaintiff and his VA counselor actively reviewed activity sheets to try to find something that would be therapeutic for Plaintiff to do.

20.     **THAT** Plaintiff and his VA counselor were unsuccessful identifying suitable therapeutic activities until Plaintiff identified the auto body program available with Defendants.

21.     THAT since Plaintiff enjoyed working with his hands, he and his VA counselor agreed that Defendants' auto body program might help him find a way to get out and participate once again in normal life activities.

22.     THAT as a part of his ongoing PTSD therapy, Plaintiff enrolled as a student with Defendants and each of them.

23.     THAT Plaintiff began classes with Defendant LCCC and believed that he was progressing well because he enjoyed working with his hands and feeling productive.

24.     THAT on September 16, 2011, while in Defendants' Welding Block Class, Plaintiff needed to cut some strips of metal into small blocks.

25.     THAT LCCC students like Plaintiff were instructed to perform metal cutting on a large mechanical power press (a jet foot shear) in Defendant LCCC's shop.

26.     THAT Plaintiff took his metal strips to the mechanical power press to be cut.

27.     THAT Plaintiff's LCCC instructor, Defendant Rob Benning (hereinafter Defendant Benning), had incorrectly set up the machine for use as a metal cutting device.

28.     THAT Plaintiff, under Defendant Benning's guidance, approached the mechanical power press to cut the metal strips.

29.     THAT Defendant Benning held three strips of the metal to be cut and Plaintiff held three strips of the metal to be cut on the mechanical power press.

30.     THAT the mechanical power press was operated by inserting the metal to be cut and then the operator would step on a foot pedal to activate the press and make the cut.

31.     THAT during the subject incident of this *Complaint*, Defendant Benning acted as the operator and both men began pushing the strips into the press.

32.     THAT unbeknownst to Plaintiff, a safety device which would have prevented an

operator's fingers from entering the dangerous area of the mechanical power press had been removed from the mechanical power press.

33.    **THAT** Defendant Benning apparently knew how to keep his [Defendant Benning's] fingers out of harm's way, but Plaintiff did not know that his fingers were at risk.

34.    **THAT** as Plaintiff pushed the metal strips forward, Defendant Benning stepped on the foot pedal of the mechanical power press, causing the shear of the mechanical power press to come down, amputating and mutilating the tips of two of Plaintiff's fingers before cutting the pieces of metal.

35.    **THAT** subsequent to Plaintiff's fingers being amputated, Defendant Benning grabbed a bag and put the severed portions of Plaintiff's fingers into the bag.

36.    **THAT** Defendant Benning next called a fellow instructor and then, upon information and belief, Defendant Benning placed a call to ambulance services.

37.    **THAT** Defendant DOE1, a member of Defendant LCCC's security personnel showed up next and took Plaintiff's driver's license to take down a report.

38.    **THAT** Plaintiff was too nauseated and disoriented to transport himself to medical facilities.

39.    **THAT** Plaintiff was transported to Cheyenne Regional Medical Center via ambulance.

40.    **THAT** Plaintiff received treatment for his mutilated hand at Cheyenne Regional Medical Center and Cheyenne Orthopaedics, P.C.

41.    **THAT** Plaintiff sustained serious, severe and permanent physical injury to, but not necessarily limited to, his left hand due to the partial amputation of his left middle finger and injured left ring finger.

42.    **THAT** two of Plaintiff's fellow students at LCCC drove to the hospital to see Plaintiff.

43.   THAT Defendant Benning made a call to check on Plaintiff over the weekend.

A.   THAT during Defendant Benning's conversation with Plaintiff, Defendant Benning mentioned calling Defendant LCCC's insurance administrator, someone he identified as "Jenny," (hereinafter Defendant DOE2) regarding Plaintiff's medical costs.

B.   THAT according to Defendant Benning, Defendant DOE2 indicated that there was no insurance coverage for this type of incident for students, indicating further that only employees were covered.

C.   THAT Defendant DOE2, further indicated that students were required to carry their own medical insurance.

44.   THAT subsequent to Plaintiff's injury, the safety apparatus was incorrectly reinstalled on the mechanical power press by Defendant Benning and/or DOE 3 and another press was ordered for Defendant LCCC's shop classroom.

45.   THAT subsequent to Plaintiff's injury, Plaintiff was alienated by his instructors and the other members of Plaintiff's auto body class.

46.   THAT despite the pain Plaintiff continued to experience, Plaintiff soldiered on and completed the welding class, but did not attain his goal of completing the automobile program

47.   THAT Plaintiff's hope for PTSD therapy (attending classes with Defendant LCCC) had dramatically turned into another source of pain and injury.

48.   THAT beyond the physiological and psychological damage of the injuries suffered as a direct result of the injuries Plaintiff sustained at the mechanical power press in Defendant LCCC's shop classroom, the coldness of Defendant LCCC's institutional response greatly exacerbated his psychological wounds.

49.   THAT, subsequent to his fingers being mutilated, Plaintiff daily struggled with the

exhaustion of hyper vigilantism and further sank into deep depression.

50.     THAT Defendants DOE4 and DOE5 are administrators and/or supervisors within Defendant LCCC's staff and/or operations responsible for designing, implementing, requiring and administrating appropriate training and supervision of Defendant LCCC's employees and classroom instructors.

51.     THAT Defendants DOE6 and DOE7 are administrators and/or supervisors within Defendant LCCC's staff and/or operations responsible for designing, implementing, requiring and administrating appropriate training, accommodation and supervision of Defendant LCCC's employees and classroom instructors relating to the Americans with Disabilities Act and/or students with disabilities.

52.     THAT the training and supervision referenced in the immediately previous paragraphs involves all aspects of training and supervision to ensure student safety in Defendants' and each Defendant's shop classrooms and all aspects of training and supervision to ensure that the appropriate and required reasonable accommodations are extended to Defendants' and each Defendant's students with federally protected disabilities.

53.     THAT the State of Wyoming Department of Workforce Services (OSHA) paid a visit to Defendants and investigated the matter of Plaintiff's injury on October 5, 2011.

54.     THAT OSHA found Defendants' and each of Defendant's shop classrooms in a deplorable state, with eight (8) serious and an additional eight (8) non-serious items being identified, including the following:

         A.     THAT the guard on the mechanical power press that injured Plaintiff was still not properly installed;

         B.     THAT the mechanical power press was improperly set-up by Defendants and

that such improper set-up represented a serious safety issue for Defendants' and each Defendant's students;

C.     **THAT** Defendants' and each Defendant's students were still using the mechanical power press that injured Plaintiff with the guard improperly installed;

D.     **THAT** there was no guardrail protecting students from falling from an overhead area regularly accessed by ladder;

E.     **THAT** the bench top grinder was missing a guard;

F.     **THAT** the covers on the overhead florescent bulbs were missing;

G.     **THAT** the splash guard goggles for use by Defendants' and each Defendant's student were too dirty and therefore unusable;

H.     **THAT** a critical fire extinguisher was blocked by a tool box;

I.     **THAT** the portable fire extinguishers were not being regularly inspected;

J.     **THAT** an electrical panel was not labeled so the circuits it controlled could be shut-off in an emergency;

K.     **THAT** other electrical panels were not accessible in an emergency because they were blocked with a table;

L.     **THAT** containers full of unknown chemicals were not labeled;

M.     **THAT** the MSDS sheets for on-site chemicals were missing or not organized so that first response procedures could be identified in an emergent situation; and

N.     **THAT** there was no certified operator on-site for the Toyota forklift and the forks on the forklift had been drilled with holes that seriously weakened their carrying capacity.

55.     **THAT** the nature of the safety hazards show an alarming disregard for the safety of the students trusting Defendants and each Defendant for protection and education in their areas of

study.

56.     THAT Defendants' and each Defendant's response to the safety hazards identified by OSHA personnel show a shocking ignorance of Defendants and each Defendant regarding normal and routine safety procedures necessary to protect the students from serious injury within Defendants' shop classroom.

57.     THAT Defendants' and each Defendant's ignorance and apathy, recorded as "employer knowledge" by the OSHA inspectors on their report is demonstrative of Defendants' and each Defendant's comprehensive failure to meet their duties of providing a safe shop classroom for their students:

        A.     THAT in response to the OSHA citation, "Unsecured argon gas cylinder," Defendant Robert Lafaso (hereinafter "Defendant Lafaso") stated to OSHA personnel that he didn't know this was a problem;

        B.     THAT in response to the OSHA citation, "No railing to prevent falls," Defendant Robert Benning stated to OSHA personnel that he did not realize that this area needed to be guarded;

        C.     THAT in response to the OSHA citation, "Forklift forks weakened by drilling," Defendant Lafaso stated to OSHA personnel that he did not use the forklift, but [the forklift] was used by Defendant Larry Vanwhy (hereinafter "Defendant Vanwhy") and students at times;

        D.     THAT in response to OSHA personnel pointing out that the forklift owned by Defendant LCCC was being operated by an uncertified operator, Defendant Vanwhy stated to OSHA personnel that he was certified, but at the same time Defendant Vanwhy could not produce a certification card, which is required to be kept on the operator at all times and further that while Defendant Vanwhy was talking with OSHA personnel, Defendant Vanwhy became very irritated

about OSHA personnel's investigation regarding this issue to the extent that Defendant Vanwhy would not give the OSHA personnel his last name.

E.     THAT in response to the OSHA citation, "Bench grinder missing protective guard," Defendant Lafaso stated to OSHA personnel that he didn't realize that the guard was missing;

F.     THAT in response to the OSHA citation, "Overhead bulbs not protected from impact," Defendant Benning stated to OSHA personnel that he did not realize that the lights were not protected;

G.     THAT in response to the OSHA citation, "Extension cord improperly used," Defendant Benning stated to OSHA personnel that he did not realize that an extension cord could not be used in that manner;

H.     THAT in response to the OSHA citation, "Improperly maintained splash goggles," Defendant LaFaso stated to OSHA personnel that he did not realize that the goggles were dirty and that they would get a new pair;

I.     THAT in response to the OSHA citation, "Improperly marked fire extinguisher locations and fire extinguisher blocked by a tool box," Instructor Robert Benning stated to OSHA personnel that he did not realize that the fire extinguishers were not getting monthly checks and [that he] never paid attention to the tool box blocking the fire extinguisher.

J.     THAT in response to the OSHA citation, "No fire extinguisher inspections," Instructor Robert Benning stated to OSHA personnel that he did not realize that the fire extinguishers were not getting checked.

K.     THAT in response to the OSHA citation, "Unlabeled electrical panel," Instructor LaFaso stated to OSHA personnel that he did not realize that the panel was not labeled

correctly.

L.    **THAT** in response to the OSHA citation, "Electrical panel could not be accessed in an emergency," Defendant LaFaso stated to OSHA personnel that he did not realize that the table blocking the panel was an issue.

M.    **THAT** in response to the OSHA citation, "No list of MSDS sheets for chemicals used at the facility," Defendant LaFaso and Defendant Jared Cooper (hereinafter "Defendant Cooper") stated to OSHA personnel that they did not know that they needed a master list.

N.    **THAT** in response to the OSHA citation, "One gallon of unlabeled chemicals," Defendant LaFaso and Defendant Vanwhy stated to OSHA personnel that they did not know why the chemical container was unlabeled.

O.    **THAT** in response to the OSHA citation, "No MSDS for cleaner being used," Defendant LaFaso, Defendant Vanwhy and Defendant Cooper stated to OSHA personnel that they did not know why the MSDS was missing.

P.    **THAT** in response to OSHA personnel pointing out the serious infraction of the guard on the mechanical power press that injured Plaintiff being installed incorrectly, Defendant Benning stated that the clap down bar was a little higher [at the time of Plaintiff's injury] than it was at the time of the inspection.

Q.    **THAT** Defendant Benning failed and/or refused to inform OSHA personnel that the guard on the mechanical power press that injured Plaintiff was not installed at all at the time of Plaintiff's injury.

58.    **THAT** subsequent to the OSHA inspection, Defendants and each Defendant began to treat Plaintiff like a pariah because his injury resulted in the OSHA inspection.

59.    THAT Defendants and each of them hold themselves out as being experts in their areas.

60.    THAT Defendants and each of them solicit students to come from all over to be taught how to succeed in the auto body career path.

61.    THAT due to the callous treatment received from Defendants and each Defendant and the pain Plaintiff experienced in working with his mutilated hand, Plaintiff was too discouraged to continue and left the automobile program that he at first enrolled for therapeutic reasons and came to dearly enjoy.

62.    THAT at all times pertinent to the facts giving rise to this *Complaint*, the individual Defendant's named herein were employed by Defendant LCCC and/or Defendant State of Wyoming and each and every act, error or omission herein alleged to have been committed by the individual Defendants was committed within the scope of their duties of such employment.

63.    THAT Plaintiff required extensive follow-up counseling and therapy as a result of the psychological and emotional impact of the injuries suffered as a result of Defendants' failure to accommodate his disability.

64.    THAT Plaintiff continues to search for therapeutic activities to recover from his injuries suffered as a a result of Defendants and each of their failure to accommodate his disability.

65.    THAT to this day, Plaintiff's injured fingertips are numb.

66.    THAT to this day, Plaintiff has difficulty grasping small or fine objects.

## IV.

### FIRST CLAIM FOR RELIEF
### PREMISES LIABILITY

67.    THAT Plaintiff incorporates herein and re-alleges by this reference all preceding

paragraphs of this *Complaint.*

68.     THAT Defendants and each of them, as owners and operators and/or instructors within a community college open to the public, owed a duty to their students therein, including Plaintiff, to keep the premises of the shop classroom, including the machinery, in a reasonably safe condition for use by their students.

69.     THAT Defendants and each of them had a duty to exercise reasonable care at the business premises which included an ongoing duty to inspect its property for potential hazards for its students.

70.     THAT in breach of such duties, Defendants and each of them negligently failed to inspect the business premises and rectify, warn or restrict access to a dangerous condition or conditions in the form of an mechanical power press for use by Defendants' student population without a safety guard which created an unreasonable risk of injury to Defendants' students, including Plaintiff.

71.     THAT Defendant LCCC is liable for the conduct of its employees under the doctrine of *respondeat superior.*

72.     THAT as a direct and proximate cause of Defendants' and Defendant's negligent breach of duties of reasonable care on its business premises, Plaintiff sustained serious bodily injuries and shocks to his bodily systems further resulting in great physical, mental and emotional pain and suffering as alleged as damages herein below in Section VII of Plaintiff's *Complaint.*

73.     THAT the injuries described herein experienced by Plaintiff were caused solely and proximately by Defendants' negligence, without any comparative or contributory fault or negligence on the part of Plaintiff.

## V.

## SECOND CLAIM FOR RELIEF
## NEGLIGENCE

74.     **THAT** Plaintiff incorporates herein and re-alleges by this reference all preceding paragraphs of this *Complaint.*

75.     **THAT** Defendants and each of them held themselves out to the community and to the student population at LCCC to be experts in the respective fields of instruction.

76.     **THAT** Defendants and each of them, as owners and operators and/or instructors within a community college open to the public, owed a duty to their students therein, including Plaintiff, to keep the premises of the shop classroom, including the machinery, in a reasonably safe condition for use by their students.

77.     **THAT** Defendants and each of them, as supervisors, trainers and as educators owed a duty to provide instruction with information regarding the common dangers and injuries to be guarded against in a shop classroom with machinery such as Defendants' subject shop classroom.

78.     **THAT** Defendants and each of them owed Plaintiff a duty to exercise reasonable care and precaution in performance of their duties as expert instructors and/or an educators so as to not place Plaintiff in a dangerous and compromised situation that would likely result in injury such as the subject injuries sustained by Plaintiff on September 16, 2011.

79.     **THAT** Defendants and each of them knew or by exercising due care should have known, by virtue of their position and status as expert trainers and educators, that the subject mechanical power press should not have been operated without the requisite safety guards installed.

80.     **THAT** Defendants knew or should have known, by virtue of their position and status as expert trainers and educators, the applicable safety policies and the applicable rules and

regulations of OSHA relating to the machinery within Defendants' shop classroom in general and specifically the safe operation of the subject mechanical power press.

81.   THAT the individual Defendant's named above, in breach of their duties described above, carelessly, recklessly and negligently:

A.   Failed to follow or ignored or failed to acknowledge written directives given to them, or supplied to them or posted on the premises relative to the safe operation of the subject mechanical power press;

B.   Failed to set-up, maintain and upkeep the subject mechanical power press in a safe and good condition for use by students within Defendants' shop classroom;

C.   Failed to prevent a menace and dangerous condition in the refusal to decommission the subject mechanical power press from use by the students when it was improperly set-up and also at the point the safety guard came off or was removed.

D.   Permitted and encouraged students to use the subject mechanical power press with critical safety equipment removed;

E.   Failed to keep a proper lookout and monitor the activities of Plaintiff with regard to the subject mechanical power press;

F.   Failed to safeguard Plaintiff as he attempted to shear metal while Defendant Benning operated the subject mechanical power press;

G.   Failed to follow proper safety procedures while supervising and operating the subject mechanical power press while Plaintiff cut metal;

H.   Failed to decommission the subject mechanical power press from use by the students when incorrectly set up and also at the point the safety guard came off or was removed; and

I.      Failed to properly respond to the exigent circumstances of Plaintiff's PTSD, including, without limitation, Plaintiff's psychological vulnerability.

82.    **THAT** Defendant LCCC in breach of its duties described above, carelessly, recklessly and negligently:

A.      Failed to properly train their instructors and supervisors regarding the proper safety procedure as to the operation of the subject mechanical power press and the supervision of students using such mechanical power press.

B.      Failed to ensure that the individual Defendants named herein read and understood and properly acknowledged the written directives and rules and regulations relating to the proper use and operation of the subject mechanical power press.

C.      Failed to properly supervise their instructors and supervisors regarding the implementation of proper safety procedures as to the operation of the subject mechanical power press and the proper care and monitoring of students learning how to use such mechanical power press.

D.      Failed to ensure the proper set-up and maintenance of the subject mechanical power press for safe use by students in the shop classroom.

E.      Failed to decommission the subject mechanical power press from use by the students when incorrectly set up and also at the point the safety guard came off or was removed.

F.      Failed to properly respond to the exigent circumstances of Plaintiff's PTSD, including, without limitation, Plaintiff's psychological vulnerability.

G.      Failed to properly respond to the exigent circumstances of Plaintiff's injury, including, without limitation, Plaintiff's physiological and psychological injuries.

83.    **THAT** it was reasonably foreseeable that operating the subject mechanical power press

without the required and necessary safety guards would result in the subject physiological and psychological injuries sustained by Plaintiff.

84.    THAT Defendants' and each of them carelessly and needlessly breached their duties as described above so as to cause Plaintiff to become an innocent victim of an unreasonably hazardous condition created, continued and concurred in by the action of Defendants.

A.    THAT such breach of duty also included Defendants' failure to properly train and supervise Plaintiff's instructors regarding their duties not to put Plaintiff in unreasonably hazardous conditions, such as the operation of the mechanical power press without the safety guard properly installed; and

B.    THAT such breach of duty also included Defendants' failure to design, implement and require all instructors to receive training and supervision regarding the dangers associated with instructing students such as Plaintiff in the operation of machinery in the shop classroom.

85.    THAT such unreasonably hazardous condition was foreseeable to Defendants if appropriate actions were not taken to make safe the machinery, premises and students within Defendant LCCC's shop classroom.

86.    THAT but for the negligence of Defendants, Plaintiff would have used the mechanical power press unharmed, and therefore such negligence was the proximate cause of Plaintiff's physiological and psychological injuries.

87.    THAT the negligence of Defendants was the proximate legal cause of Plaintiff's physiological and psychological injuries.

88.    THAT Defendant Robert Benning's breach of duty included directing Plaintiff into

an unreasonably risky, close and dangerous situation by guiding Plaintiff to place his metal to be cut upon the mechanical power press and push it forward with his hands.

89.     THAT the physiological and psychological injuries to Plaintiff were caused solely by the negligence of Defendants without any contributory negligence on the part of Plaintiff.

90.     THAT Plaintiff is entitled to recover from Defendants for all damages proximately caused by Defendants breach of their duties, including, but not limited to, the damages listed in Section VII of Plaintiff's *Complaint*.

## VI.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

91.     THAT over twenty-four years after Congress passed our nation's landmark civil rights law for people with disabilities, Defendants and each of them continue to discriminate against persons with disabilities.

92.     THAT on July 26, 1990, Congress enacted and President George H. W. Bush signed into law the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101, *et seq.*, establishing one of the most important civil rights laws for people with disabilities in our country's history.

93.     THAT Congress explicitly stated that among the purposes of the ADA are:

A.     "to provide a clear and comprehensive national mandate for the elimination of discrimination against people with disabilities;"

B.     "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities, ...;"

C.     "to invoke the sweep of congressional authority, including the power to enforce the 14th Amendment and to regulate commerce, in order to address the major areas of

discrimination faced day-to-day by people with disabilities."

42 U.S.C. §12101(b).

94.     **THAT**, among its findings within the ADA, Congress determined:

> [I] ndividuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and regulated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society[.]

*See* 42 U.S.C. §§ 12181, *Findings and purpose,*(a)(1)-(8).

95.     **THAT** the ADA was modeled, in part, on Section 504 of the *Rehabilitation Act of 1973* ("Section 504"), 29 U.S.C.A. §794.  Section 504 applies to Defendants and each of them, because they receive federal financial assistance.

96.     **THAT** intentional discrimination, as is required to recover compensatory damages under the Rehabilitation Act, can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies or actions will likely result in a violation of federally protected rights. *See Id.* §504(a), 29 U.S.C.A. §794(a).

97.     **THAT** in late 2009, it was estimated that PTSD affected about 7.7 million American adults. *See NIH Medicine Plus*, Winter 2009 Issue: Volume 4, No. 1, pp. 10-14.

98.     **THAT** the U.S. Department of Veteran's Affairs estimates that PTSD affects:

A.      Almost 31 percent of Vietnam veterans;

B.      As many as 10 percent of Gulf War (Desert Storm) veterans;

C.      11 percent  of veterans of the war in Afghanistan; and

D.      20 percent of Iraqi war veterans.

*Id.*

99.   THAT in spite of the long history and general public knowledge the ADA has received since 1990, and the astounding prevalence of PTSD in our country, Defendants and each of them continue to discriminate against people with the disability PTSD.

100.   THAT Defendants and each of them had a duty to prepare, train, educate and accommodate themselves, their institution and their shop classroom for students such as Plaintiff with PTSD.

101.   THAT Defendants and each of them failed to sufficiently prepare, train, educate and accommodate themselves, their institution and the shop classroom for students such as Plaintiff with PTSD, such failure(s) being violation(s) of the ADA.

102.   THAT Title II of the ADA prohibits public entities from denying, on the basis of disability, the benefits of the services, programs or activities of the public entity, or from subjecting persons with disabilities to discrimination. 42 U.S.C. §12132.

103.   THAT Defendant LCCC is a public entity covered by the ADA. 42 U.S.C. §12131(1).

104.   THAT Defendants and each of them violated the ADA by refusing to provide reasonable response and accommodations for Plaintiff with his PTSD disability upon being injured within their shop classroom.

105.   THAT the discrimination of Defendants and each of them can be inferred from Defendants' and each of their deliberate indifference to Plaintiff's injuries and subsequent alienation and ostracizing of Plaintiff until Plaintiff left the program.

106.   THAT the deliberate actions and indifference of Defendants and each of them created the strong likelihood that pursuit of their questioned policies or actions will likely result in a

violation of federally protected rights.

107.    **THAT** Defendants' and each of their failures and violations have caused and continue

to cause distinct, palpable and perceptible injury to Plaintiff, including injuries and damages listed

below in Section VII of Plaintiff's *Complaint.*

## VII.

## <u>DAMAGES</u>

108.    **THAT** by reason of the above Plaintiff:

  A.    was rendered sick, sore, lame and disabled;

  B.    was incapacitated for a considerable time;

  C.    was unable to attend to his usual duties for considerable time, which included

employment;

  D.    required medical aid and attention; and

  E.    suffered grievous physical pain and mental anguish.

109.    **THAT** as a direct and proximate result of Defendants commissions and omissions,

which were negligent, and which were willful, wanton, intentional, careless and in reckless disregard

of the safety of others and the consequences of their actions under the circumstances and conditions,

Plaintiff sustained injuries, damages and losses, including but not limited to:

  A.    past, present and future pain and suffering;

  B.    past medical expenses in excess of $22,804.03, and present and future medical

expenses;

  C.    loss of earning capacity, economic damages and non-economic damages;

  D.    mental and emotional pain and suffering;

E.      loss of enjoyment of life;

F.      permanent physical impairment;

G.      emotional distress, shock, fright and worry;

H.      loss of time and opportunity;

I.      incidental damages;

J.      discrimination;

K.      attorney's fees and costs; and

L.      other injuries not yet determined.

**WHEREFORE**, Plaintiff requests a judgment against the Defendants for:

1.      general damages according to proof;

2.      special damages for medical and related expenses according to proof;

3.      damages for loss of earnings according to proof;

4.      prejudgement and post-judgment interest according to law;

5.      costs of this action; and

6.      such other and further relief as the Court deems just and appropriate in light of the facts and circumstances.

### PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL CLAIMS ALLOWABLE BY LAW.

**DATED** this _____ of April, 2014.

PLAINTIFF:  Michael Plemens

D. Stephen Melchior
MELCHIOR LAW FIRM, P.C.
2010 Warren Avenue
Cheyenne, WY 82001
(307) 637-2323 *office*
melchiorlawfirm@aol.com
*Attorney for Plaintiff*

# MELCHIOR LAW FIRM, P.C.

*Attorneys and Counselors at Law*

D. Stephen Melchior, Esq.

Bryan K. Rogers, Esq.

2010 Warren Avenue
Cheyenne, Wyoming 82001
Phone: (307) 637-2323
Fax:  (307) 637-2313
E-Mail:  melchiorlawfirm@aol.com

Charlotte Lakamp
*(Office Manager)*

August 12, 2013

## VERIFIED AND CERTIFIED NOTICE OF CLAIM

**BUSINESS OFFICE**
Carol Hoglund
Vice President of Administration &
Finance
Laramie County Community College
1400 East College Drive
Cheyenne, WY  82009

**PRESIDENT'S OFFICE**
Dr. Joe Schaffer
Laramie County Community College
1400 East College Drive
Cheyenne, WY 82007

**GENERAL COUNSEL**
Gay Woodhouse
Woodhouse Roden, L.L.C.
1912 Capitol Avenue, Suite 500
Post Office Box 1888
Cheyenne, WY 82003

**SECRETARY OF THE BOARD OF
TRUSTEES FOR LCCC**
Bill Dubois
Secretary of the Board of Trustees
c/o The President's Office
Laramie County Community College
1400 East College Drive
Cheyenne, WY 82007

Re:     *Michael Plemens, Claim Pursuant to Wyo. Stat. §1-39-101.*

Dear President Schaffer and Mr. Dubois:

This verified and certified Notice of Claim is submitted pursuant to Wyo. Stat.*§1-39-101*, and Article 16 § 7 of the Wyoming Constitution.

1.      **The time, place and circumstances of the alleged loss or injury, including the name of the public employee involved, if known.**

a.      <u>Time</u>:  During the regularly scheduled Welding Block Class in which Mr. Plemens was enrolled as a student on September 16, 2011.

b.      <u>Place</u>:  Laramie County Community College classroom.



        c.    <u>Circumstances</u>:     Michael Plemens is an ex-serviceman, having served our county in the 1st Calvary Division of the United States Army from September of 1990 until April of 1991, including active deployment in Desert Storm. As with many of the brave solders that have sacrificed so much for us at home, Michael endured horrific events and eventually was discharged due to a positive diagnoses of Post Traumatic Stress Disorder (PTSD). After returning home from the war, Michael has continually struggled to work through the day-to-day consequences of his PTSD.

        Michael's recovery has taken precious years from his life. Since his return from combat, Michael has actively sought counseling from the United States Veteran's Administration and particularly with his counselor, Lewis P. Waldron. His struggles with the post-war symptoms of PTSD, including hyper-vigilance (ironically an increased awareness of his surrounding environment, sometimes even frequently scanning the environment to identify potential sources of threat) kept him exhausted and depressed. Michael and his counselor actively reviewed activity sheets to try to find something that would be therapeutic for Michael to do. They were unsuccessful until Michael identified the auto body program available at LCCC. Since Michael enjoyed working with his hands, he and his counselor felt that LCCC's program might help him find a way to get out and participate again in normal life. Michael's counselor, Lewis Waldron, agreed. As a part of his therapy, Michael enrolled as a student at LCCC. He felt that the program would offer benefits to aid in his recovery.

        Michael began classes and felt that he was progressing well. He enjoyed working with his hands and feeling productive. On September 16, 2011, while in the Welding Block Class, Michael needed to cut some strips of metal into small blocks. The students were instructed to perform this type of work on a large mechanical power press (a jet foot shear) in the LCCC shop. Michael took his metal strips to the press to be cut. His LCCC instructor, Rob Benning, set up the machine and Michael assisted. Mr. Benning held three strips of the metal and Michael held three strips. The mechanical power press was operated by inserting the metal to be cut and then the operator would step on a foot pedal to activate the press and make the cut. Mr. Benning acted as the operator and both men began pushing the strips into the press. Unbeknownst to Michael, a safety device which would have prevented an operator's fingers from entering the dangerous area had been removed from the mechanical power press. Mr. Benning apparently knew to keep his fingers out of harm's way, but Michael didn't. As Michael pushed the metal strips forward, Mr. Benning stepped on the foot pedal and the power press came down, amputating and mutilating the tips of two of Michael's fingers before cutting the pieces of metal.

        Michael gasped in pain. The class was shocked. Mr. Benning grabbed a bag and put the severed portions of Michael's fingers into the bag. Mr. Benning next called a fellow instructor and then Michael believed that a call was placed to get ambulance services.

        LCCC Security showed up next and took Michael's driver's license and made a report. Michael was too nauseated and disoriented. He was transported to Cheyenne Regional Medical Center via ambulance. Michael received treatment for his mutilated hand at Cheyenne Regional Medical Center and Cheyenne Orthopaedics, P.C. (*See* Attachments 1 - 12, attached hereto and incorporated herein by reference). Michael sustained serious and permanent injury to, but not necessarily limited to, his left hand due to the partial amputation of his left middle finger and injured

left ring finger.

Two students drove to the hospital to see Michael. LCCC's response was much more discouraging to Michael. LCCC instructor Robert Benning did make a call to check on Michael over the weekend. During their conversation, Mr. Benning mentioned that he had called the LCCC insurance administrator, someone he identified as "Jenny," regarding Michael's medical costs. According to Mr. Benning, Jenny indicated that there was no insurance coverage for students, only employees were covered. Jenny further indicated that students are required to carry their own medical insurance.

Subsequent to Michael's injury, the guard was reinstalled on the mechanical power press and another press was ordered. For his part, Michael felt alienated by his instructors from the class. Despite the pain he was experiencing, he soldiered on and completed the welding class. Michael's hope for PTSD therapy (attending classes at LCCC) had dramatically turned on him. Rather than alleviate his suffering, the coldness of LCCC's institutional response greatly exacerbated his war wounds. Michael daily struggled through the exhaustion of hyper vigilantism and sunk into deeper depression. However, it was not only Michael's mutilated hand that contributed to his suffering. Incredibly, the LCCC instructors began to treat him like a pariah because his injury resulted in an OSHA inspection.

Regarding that OSHA inspection, following the amputation and mutilation of September 16, 2011, the State of Wyoming Department of Workforce Services (OSHA) paid a visit to LCCC and investigated the matter on October 5, 2011. OSHA found LCCC's shop classrooms in a deplorable state, with eight (8) serious and an additional eight (8) non-serious items being identified. The nature of the safety hazards show an alarming disregard for the safety of the students trusting LCCC for an education in this area of study:

1)  There was no guardrail protecting students from falling from an overhead area regularly accessed by ladder.
2)  The guard on the mechanical power press that injured Michael was still not properly installed.
3)  The bench top grinder was missing a guard.
4)  The covers on the overhead florescent bulbs were missing.
5)  The splash guard goggles for the student's use were too dirty to be used.
6)  A fire extinguisher was blocked by a tool box.
7)  Portable fire extinguishers were not being regularly inspected.
8)  An electrical panel was not labeled so the circuit it controlled could be shut-off in an emergency.
9)  Other electrical panels were not accessible in an emergency because they were blocked with a table.
10)  Containers full of unknown chemicals were not labeled.
11)  The MSDS sheets for on-site chemicals were missing or not organized so that first response procedures could be identified in an emergent situation.
12)  There was no certified operator on-site for the Toyota forklift and the forks on the forklift had been drilled with holes that seriously weakened their carrying capacity.

Even more alarming was the ignorance of normal safety procedures necessary to protect the students from serious injury by LCCC staff and instructors. LCCC's ignorance and apathy, recorded as "employer knowledge" by the OSHA inspectors on their report is demonstrative of LCCC's comprehensive failure to meet its duties of providing a safe classroom shop for its students:

| OSHA Citation | LCCC's Response |
| --- | --- |
| Unsecured argon gas cylinder | Instructor Robert Lafaso stated he didn't know this was a problem. |
| No railing to prevent falls | Instructor Robert Benning stated that he did not realize that this area needed to be guarded. |
| Forklift forks weakened by drilling | Instructor Robert Lafaso stated that he did not use the forklift, but [the forklift] was used by Larry Vanwhy and students at times. |
| Bench grinder missing protective guard | Instructor Robert Lafaso stated that he didn't realize that the guard was missing. |
| Overhead bulbs not protected from impact | Instructor Robert Benning stated that he did not realize that the lights were not protected. |
| Extension cord improperly used | Instructor Robert Benning stated that he did not realize that they could not use an extension cord in this manner. |
| Improperly maintained splash goggles | Instructor Robert LaFaso stated that he did not realize that the goggles were dirty and that they would get a new pair. |
| Improperly marked fire extinguisher locations and fire extinguisher blocked by a tool box. | Instructor Robert Benning stated that he did not realize that the fire extinguishers were not getting monthly checks and [that he] never paid attention to the tool box blocking the fire extinguisher. |
| No fire extinguisher inspections. | Instructor Robert Benning stated that he did not realize that the fire extinguishers were not getting checked. |
| Unlabeled electrical panel | Instructor Robert LaFaso stated that he did not realize that the panel was not labeled correctly. |

| | |
|---|---|
| Electrical panel could not be accessed in an emergency | Instructor Robert LaFaso stated that he did not realize that the table blocking the panel was an issue. |
| No list of MSDS sheets for chemicals used at the facility | Instructor Robert LaFaso and Jared Cooper stated that they did not know that they needed a master list. |
| One gallon of unlabeled chemicals | Instructor Robert LaFaso and Larry Vanwhy stated that they did not know why the chemical container was unlabeled. |
| No MSDS for cleaner being used | Instructor Robert LaFaso, Larry Vanwhy and Jared Cooper stated that they did not know why the MSDS was missing. |

LCCC holds out its instructors as being experts in their areas.[1] They solicit students to come from all over to be taught how to succeed in the auto body career path. The OSHA inspection demonstrates a shocking and reckless disregard by LCCC for their responsibilities as instructors, their knowledge of common safety precautions, and the welfare of their students.

Besides the citations listed above, I have reserved two of the most alarming citations until now. These were both listed by OSHA as "serious" and I believe are highly indicative of LCCC's overall attitude toward its duty to provide a safe environment for students. First, upon pointing out that the LCCC forklift was being operated by an uncertified operator, LCCC Instructor Larry Vanwhy stated that he was certified, but at the same time he could not produce a certification card, which is required to be kept on the operator at all times. What really makes LCCC's response to this serious infraction suggestive of LCCC's attitude toward safety is that the OSHA inspector reported that, "Larry Vanwhy (Instructor, Diesel) while talking with CSHO was very irritated about this issue and would not give CSHO his last name." LCCC's response is simply incredible! The agency charged by the United States Congress "to assure safe and healthful working conditions for working men and women by setting and enforcing standards and by providing training, outreach, education and assistance"[2] is treated with disrespect and contempt for pointing out serious and valid safety issues faced by LCCC's students.

Secondly, and equally as shocking and disturbing is that the guard on the jet foot shear (the

---

[1] From LCCC's website: The automotive body repair program is designed to prepare the student for employment in the automotive repair business as well as to meet the needs of those who want to upgrade their skills or meet some personal objectives in auto body repair. The program leads to a nine-month certificate or an Associate of Applied Science degree. Benefits: The auto body program at LCCC is ASE/NATEF certified. This certification means there is an outside automotive source checking the curriculum, tools and equipment to ensure everything we do is current, up-to-date, and what employers are looking for.

[2] *See* OSHA's website - *About OSHA.*

mechanical power press) which amputated Michael's fingers was *still* not properly installed at the time of the OSHA inspection almost a month later during the school semester *and students were still using the press*!  When the OSHA inspector pointed out this serious infraction, LCCC instructor Robert Benning stated that the clap down bar was a little higher than it was at the time of the inspection. OSHA was not informed that when Michael's fingers were amputated and mutilated in the press, the guard was not installed at all. It is simply unconscionable that Michael's injury was insufficient motivation for LCCC to correctly install the guard before other students were instructed to continue operating it!  It is equally unconscionable that LCCC's instructor was not forthright regarding the condition of the press at the time of Michael's injury.

In each of the critical and serious areas as identified by OSHA, LCCC demonstrated a reckless and wanton disregard for the safety of its students.  It is only the statutory bar against punitive damages that prevents LCCC suffering huge liability for its gross negligence. No jury after reading OSHA's report would conclude that LCCC even came close to meeting its clear duty to provide a safe working environment for Michael or for its students.  No jury would fault Michael for following his instructor's lead in operating a mechanical power press.  The admitted ignorance of the LCCC instructors is reprehensible and for a recovering soldier, a trust has been forever broken.

Michael Plemens continues to search for therapeutic activities to recover from his war wounds after the bitter disappointment of LCCC.  After his injury and the pain he experienced in working with his hands, compounded by the callous behavior demonstrated by LCCC, Michael simply left the automobile program that he at first dearly loved.

To this day, Michael's injured fingertips are numb.  He has difficulty grasping small or fine objects.  He still is surprised how much the injury has affected him.

        d.    <u>Identify of Public Employees Involved</u>:  The public employees involved were various directors, administrators, management, employees and agents of Laramie County Community College, and said organizations' board of trustees.  The names of the other public employees involved in or otherwise having knowledge of the subject incident presently known to Claimant are:

> Robert Benning
> LCCC Class Instructor
> operator of machinery at issue;

> Robert LaFaso
> LCCC Class Instructor
> Contacted regarding transport of Michael Lee Plemens to the emergency room;

> Unknown Name
> LCCC Security

Investigating Personnel;

Unknown
LCCC Class Instructor
Reinstalled the safety guard onto the machinery;

Robert Lafaso, LCCC Class Instructor
Larry Vanwhy, LCCC Class Instructor
Robert Benning, LCCC Class Instructor
Jared Cooper, LCCC Class Instructor
Carol Hoglund, Vice President of Administration & Finance
Services.
Present during OSHA investigatory visit;

Jenny [Unknown Last Name]
LCCC Insurance Liaison
Denied that LCCC had insurance coverage that would extend to
Michael Lee Plemens as a result of this incident and denied that
LCCC had any liability in the incident.

2. **The name, address and residence of the claimant and his representative or attorney, if any.**

a.      Name and address of the Claimant:

Michael Lee Plemens
7103 Tumbleweed Drive
Cheyenne, WY 82009

b.      The name and address of the Claimants' attorney is as follows:

D. Stephen Melchior
MELCHIOR LAW FIRM, P.C.
2010 Warren Avenue
Cheyenne, WY 82001
(307) 637-2323

3. **The amount of compensation and other relief demanded:**

Claimant demands compensation in the amount of One Million Seven Hundred
Fifty Thousand Dollars ($1,750,000.00), plus pecuniary losses in an unknown amount.

*August 12, 2013 Verified and Certified Notice of Claim*
*Page 8 of 9*

These amounts are determined as follows:

| | |
|---|---|
| Medical expenses: | $13,347.21 |
| United States Department of Veterans Affairs, Subrogation Claim | Unknown Amount |

Mr. Plemens also claims general damages which bring the total amount claimed to One Million Seven Hundred Fifty Thousand Dollars ($1,750,000.00) for the pain, suffering, loss of enjoyment of life, emotional distress and loss of consortium.

All damages, not specifically enumerated herein, allowed by Wyoming law; and

Costs of this action and such other damages as are fair and just.

## PRESENTATION

Duplicate copies of this claim are presented to those individuals and entities involved.

**DATED** this *12* day of August 2013.

Michael Lee Plemens

## VERIFICATION

Pursuant to Wyoming Statute § 6-5-301(e), I, Michael Lee Plemens, have read and understand the provisions of the false swearing statute. I hereby certify under penalty of false swearing that the foregoing claim, including all of its attachments, if any, is true and accurate.

Michael Lee Plemens
*Claimant*

Date: **8/12/2013**

STATE OF WYOMING            )

*August 12, 2013 Verified and Certified Notice of Claim*
*Page 9 of 9*

COUNTY OF LARAMIE

)ss.
)

    Subscribed and sworn to before me by, a Notarial Officer, this ⟨12⟩ day of August

2013.

    Witness my hand and official seal.

CHARLOTTE N. LAKAMP · NOTARY PUBLIC
COUNTY OF LARAMIE   STATE OF WYOMING
MY COMMISSION EXPIRES JUL. 3, 2017

_____
Notarial Officer

My Commission Expires:   7/3/2017

By:   _____
D. Stephen Melchior
Melchior Law Firm, P.C.
2010 Warren Avenue
Cheyenne, WY  82001
(307) 637-2323 *phone*
(307) 637-2313 *fax*
melchiorlawfirm@aol.com



---

## PLEMENS - Claim No. EQX2940

---

**Wells,James D** <JWELLS2@travelers.com>                          Fri, Dec 20, 2013 at 4:02 PM
To: "bryankeithrogers@gmail.com" <bryankeithrogers@gmail.com>

Mr. Rogers,

We have reviewed your offer to conduct your clients deposition prior to litigation in order to evaluate the demand, but at this time we will decline.  I did extend an offer to resolve this matter for $30,000.00 (thirty thousand dollars and zero cents) on September 3, 2013, but did not receive a counter offer.  If your client has a counter offer, then please let me know.  Can you provide me with updated photos of his hand?  If yes, can you please provide them to me for our review and  evaluation.

Thanks.

**James Wells | Senior Technical Specialist | General Liability**

Travelers

6060 S. Willow Drive

Greenwood Village, CO 80110

W: 720.963.7359   F: 877.801.9674



---

This communication, including attachments, is confidential, may be subject to legal privileges, and is intended for the sole use of the addressee. Any use, duplication, disclosure or dissemination of this communication, other than by the addressee, is prohibited. If you have received this communication in error, please notify the sender immediately and delete or destroy this communication and all copies.

**EXHIBIT**

2